**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TRIPLE UP LIMITED,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>YOUKU TUDOU INC.,<br><br>　　　　　*Defendant*. | Civil Action No. 16-159 (RDM) |

## <u>MEMORANDUM OPINION</u>

This copyright infringement action is before the Court on Defendant's motion to dismiss for lack of personal jurisdiction, or, in the alternative, for failure to state a claim.  *See* Dkt. 7. Defendant is Youku Tudou Inc. ("Youku"), a Chinese internet television company.  Plaintiff is Triple Up Limited ("Triple Up"), a Seychelles corporation.  The suit concerns the performance rights to three Taiwanese movies, which were allegedly viewable on Youku's websites from within the United States.  Beyond the websites' mere accessibility, however, neither Youku, Triple Up, nor the contested works bears any case-relevant connections to the United States. Although the law governing personal jurisdiction in the context of the internet is admittedly unsettled, the contacts in this case are plainly insufficient and do not test the boundaries of that evolving doctrine.  The Court, accordingly, will grant Youku's motion to dismiss for lack of personal jurisdiction and will deny Triple Up's request for jurisdictional discovery.

## I.    BACKGROUND

Plaintiff Triple Up is a corporation located in and organized under the laws of Seychelles, an archipelago nation off the coast of East Africa.  Dkt. 1 at 4 (Compl. ¶ 15).  It claims to own

"the exclusive internet broadcasting rights . . . in the United States" for three Taiwanese movies: 沉睡的青春 ("Sleeping Youth"); 對不起, 我愛你 ("Sorry, I Love You"); and 松鼠自殺事件 ("Squirrel Suicide Incident"). *Id.* at 1 (Compl. ¶ 1); *see also* Dkt. 11-1 (Hsu Decl.).

Defendant Youku is a Cayman Islands corporation with its principal place of business in China, where it "is the leading [i]nternet television company." Dkt. 7-1 at 2–3 (Tang Decl. ¶¶ 4, 5, 9). Youku operates two website platforms on which "[u]sers can view and publish high-quality video content," and an internet search engine that allows users to search for videos. *Id.* at 2 (Tang Decl. ¶ 5). Most videos on Youku's websites have been placed there by Youku itself. *See id.* (Tang Decl. ¶ 6). Those videos consist of "professionally-produced content that Youku has licensed from third parties," as well as Youku's own "in-house productions." *Id.* In addition, however, Youku's users can upload videos of their own choosing. *Id.* Together, Youku's websites receive about 400 million unique visitors each month. *Id.* at 3 (Tang Decl. ¶ 12). Less than one percent of the websites' views come from the United States, *id.*, although the exact number of U.S. viewers is not reflected in the record. The text on Youku's websites is written entirely in Mandarin Chinese. *Id.* at 2 (Tang Decl. ¶ 5); *see also* Dkt. 1 at 7–14 (Compl. ¶¶ 29–41) (website screenshots); Dkt. 11-2 (Zhang Decl.) (same).

With respect to videos that Youku itself has uploaded, Youku employs "geoblocking" technology. Dkt. 7-1 at 2 (Tang Decl. ¶ 7). This means that Youku restricts access to those videos based on the viewer's geographic location, thus ensuring that the videos are accessible only "in locations for which Youku is authorized to display" them. *Id.* When users attempt to access restricted content from a geoblocked location, they receive an error message or are redirected to the website's main page. *Id.* (Tang Decl. ¶ 8). Youku "does not implement geoblocking" for videos uploaded by users, however. *Id.* at 4 (Tang Decl. ¶ 20).

Youku generates revenue "primarily from online advertising services and, to a lesser extent, subscription or pay-per-view-based online video services." Dkt. 11-4 at 12; *accord* Dkt. 7-1 at 3 (Tang Decl. ¶ 13). The company sells "a great majority" of its internet ad space to third-party advertising agencies, including advertising agencies in the United States. Dkt. 11-4 at 8, 12–13. Those ads are then distributed using "[i]nnovative [t]argeting" strategies to "reach targeted users based on" certain demographic markers, including "the geographic location of the user." *Id.* at 12. Thus, although Youku's websites appear in Mandarin Chinese, when accessed from the United States, Youku's videos are sometimes preceded by English-language advertisements for American products. *See* Dkt. 11-2 at 3, 12 (Zhang Decl. ¶¶ 5(e), 8) (attesting to accessing Youku's websites from the District of Columbia and seeing English-language video advertisements for, among other things, the University of Phoenix, Allstate Insurance, and Quicken Loans). Youku also earns revenue by selling subscriptions to its ad-free content service called "Youku VIP." Dkt. 11-4 at 13. Youku "is not aware of any Youku VIP subscribers that reside in the District of Columbia," Dkt. 7-1 at 4 (Tang Decl. ¶ 14), but the record is silent as to whether any subscribers may reside elsewhere in the United States.

Although Youku has no offices or employees in the United States and does not market its products or services there, *id.* at 3–4 (Tang Decl. ¶¶ 9, 17), it has at least some U.S. business connections. For example, Youku stock has been traded on the New York Stock Exchange, and Youku has maintained an agent for service of process in New York. Dkt. 11-4 at 6–7 (Youku's "Form 20-F" filed with the Securities Exchange Commission for the fiscal year 2014). Youku has also partnered with a U.S. software firm to develop "video fingerprint" technology for removing videos with "piracy issues." *Id.* at 15. And Youku has entered into "digital distribution agreement[s]" with U.S. production studios to bring American content to Youku's

platforms, *id.* at 13, and may be partnering with "U.S. entertainment companies to produce original content," Dkt. 11-9 at 2 (Lulu Yilun Chen & Stephen Engle, *Youku Looks to U.S. for Videos to Stream to Chinese Users*, BLOOMBERG (Oct. 27, 2014)).

In August and December 2015, Jiwei Zhang, one of Triple Up's attorneys in the District of Columbia, was able to stream copies of "Sleeping Youth," "Sorry, I Love You," and "Squirrel Suicide Incident" from Youku's websites. *See* Dkt. 11-2 at 1–12 (Zhang Decl. ¶¶ 5–7). One of the videos was preceded by an English-language video advertisement for the University of Phoenix. *Id.* at 3 (Zhang Decl. ¶ 5(e).) The others were preceded by advertisements for Chinese-language video games containing Mandarin Chinese text. *Id.* at 7, 10 (Zhang Decl. ¶¶ 6(e), 7(e)); *see also* Dkt. 11 at 13. There is no indication that the latter advertisements included any English-language voice-overs. *See* Dkt. 11-2 at 7, 10 (Zhang Decl. ¶¶ 6(e), 7(e)). Based on a comparison of user-uploaded content and Youku-uploaded content, Zhang infers that the three videos had been uploaded by Youku itself, and not by Youku's users. *Id.* at 13–14 (Zhang Decl. ¶ 9). Triple Up has not alleged that anyone other than Zhang has used Youku's websites to view the films at issue from within the United States.

In response, Youku maintains that it uploaded "Sleeping Youth" and "Sorry, I Love You" pursuant to an express license to display those films in China, and that it implemented geoblocking to prevent the Youku-uploaded versions from being displayed in the United States. Dkt. 7-1 at 4 (Tang Decl. ¶ 19). It says that any non-geoblocked versions of those films on its websites, as well as any versions of "Squirrel Suicide Incident," must have been uploaded by Youku's users. *Id.* (Tang Decl. ¶ 20); *see also* Dkt. 12 at 16 n.9. Youku also declares—and Triple Up does not dispute—that Triple Up notified Youku of the allegedly infringing content on January 17, 2016, and that Youku then "removed all versions of the films" from its websites

"within 24 hours." Dkt. 7-1 at 6 (Tang Decl. ¶¶ 24–25). There is no allegation that any of the three films have been available on Youku's websites in any form since January 18, 2016.

On February 1, 2016, Triple Up filed the instant complaint. Dkt. 1. It alleges that Youku itself (as opposed to its users) uploaded each of the three films to Youku's websites, where they could be viewed throughout the United States. *Id.* at 2, 6–12, 14 (Compl. ¶¶ 4, 29–37, 43–44). It also alleges more broadly that Youku's "entire business model . . . relies upon systematic, widespread, and willful copyright infringement." *Id.* at 2 (Compl. ¶ 7); *see also id.* at 4, 15–16 (Compl. ¶¶ 12, 45–47, 53–54).

Triple Up asserts four causes of action against Youku regarding each of the three films. Count One alleges infringement of the right of public performance in violation of 17 U.S.C. §§ 106(4) and 501 (including direct, vicarious, contributory, and inducement-based theories of liability). *Id.* at 17–19 (Compl. ¶¶ 57–67). Count Two alleges infringement of the rights of reproduction and distribution in violation of 17 U.S.C. §§ 106(1), 106(3), and 501 (again including direct, vicarious, contributory, and inducement-based theories of liability). *Id.* at 19–21 (Compl. ¶¶ 68–80). Count Three alleges false designation of origin, false descriptions and representations, and unfair competition under the Lanham Act, 15 U.S.C. § 1125. *Id.* at 21–22 (Compl. ¶¶ 81–87). And the last count alleges unfair competition under D.C. common law. *Id.* at 23–24 (Compl. ¶¶ 98–104). Triple Up has withdrawn its causes of action for infringement of the right to prepare derivative works under 17 U.S.C. § 106(2) and for violation of the D.C. Consumer Protection Procedures Act. Dkt. 11 at 7 n.2.

Youku has now moved to dismiss the complaint for lack of personal jurisdiction, or, in the alternative, for failure to state a claim on which relief can be granted. Dkt. 7.

## II.     LEGAL STANDARD

The Court must begin—and, in this case, end—with the motion to dismiss for lack of personal jurisdiction. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties . . . ."). On such a motion, the plaintiff bears the burden of "establishing a factual basis for the exercise of personal jurisdiction" over each defendant. *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990). It must do so by "alleg[ing] specific acts connecting [the] defendant with the forum" and "cannot rely on conclusory allegations." *Clay v. Blue Hackle N. Am., LLC*, 907 F. Supp. 2d 85, 87 (D.D.C. 2012). The Court "need not treat all of plaintiffs' allegations as true," moreover, and "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Id.* Ultimately, the Court must "satisfy itself that it has jurisdiction to hear the suit," and, to the extent necessary, "may look beyond the allegations of the complaint" to do so. *Achgazai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 173 (D.D.C. 2016).

## III.     ANALYSIS

In the usual case, establishing personal jurisdiction over a non-resident defendant requires "a two-part inquiry." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). The exercise of jurisdiction must comport with both the long-arm statute of the forum and the Constitution's due process requirements. *Id.* As explained in more detail below, the due process inquiry examines the defendant's "contacts, ties, or relations" with the forum state, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985), and, in the case of "specific" or "case-linked" jurisdiction, those contacts must give rise to the specific claims at issue, *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 923–24 (2011).

Alternatively, Rule 4(k)(2) of the Federal Rules of Civil Procedure provides that, if the claim arises under federal law, if a summons has been served, and if the defendant is beyond the jurisdiction of any one state's courts, then federal courts may exercise jurisdiction—without regard to the forum's long-arm statute—so long as due process requirements are met. *See* Fed. R. Civ. P. 4(k)(2); *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). For this purpose, the Court may assume that the defendant is outside the long-arm jurisdiction of any one state's courts unless the defendant "concede[s] to the jurisdiction of any state." *Mwani*, 417 F.3d at 11. And, although the "forum" for purposes of Rule 4(k)(2) is not a single state but "the United States as a whole," *id.*, the constitutional inquiry is "otherwise the same," *Safra v. Palestinian Auth.*, 82 F. Supp. 3d 37, 47 (D.D.C. 2015).

Here, Triple Up argues only for the exercise of specific jurisdiction under the "transacting business" prong of the District's long-arm statute, D.C. Code § 13-423(a)(1), or, in the alternative, under Rule 4(k)(2). Dkt. 11 at 14–24 & nn.3 & 7. Although Youku disputes whether the "transacting business" prong properly applies to these facts,[1] *see* Dkt. 7 at 21; Dkt. 12 at 7–9,

---

[1] There is no question that the "transacting business" prong of the District's long-arm statute "is coextensive with the [D]ue [P]rocess [C]lause," *Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 242 (D.C. 2015), at least as far as the amount and quality of required contacts is concerned. But there is a question whether that prong applies to actions "sounding in tort" in the first place. Because other, narrower provisions in the long-arm statute speak specifically to tort actions, *see* D.C. Code § 13-423(a)(3)–(4), and because Youku contends that copyright infringement "sounds in tort," Youku argues that the "transacting business" prong is necessarily inapplicable here. *See* Dkt. 7 at 21; *see also Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 27 (D.D.C. 2014) (declining to construe "transacting business" jurisdiction to encompass tort actions that the tort-specific provisions would otherwise disallow). As explained below, the Court need not address this issue—or any others that might preclude the application of the "transacting business" prong to these facts—because the motion must ultimately be resolved on due process grounds.

Youku does not dispute for purposes of Rule 4(k)(2) that three of the claims against it arise under federal law or that it was properly served. *See* Dkt. 12 at 7–16.  Nor does Youku concede to personal jurisdiction in the courts of any state.[2]  *See id.*

As a result, whether or not the D.C. long-arm statute authorizes the exercise of personal jurisdiction here, the Court must still address the constitutional questions.  The logic is as follows:  If the D.C. long-arm statute allows for jurisdiction, then, under the ordinary framework, the Court must go on to consider whether the exercise of jurisdiction would satisfy due process.  But if the D.C. long-arm statute does *not* apply, then Rule 4(k)(2) governs, and, because the non-constitutional predicates to the use of 4(k)(2) are met, the Court must consider the due process inquiry regardless.  The constitutional issues in this case are therefore unavoidable.[3]

The Court, accordingly, will address a single, dispositive question:  Are Youku's contacts with the United States as a whole constitutionally sufficient to justify the exercise of specific personal jurisdiction over it with respect to Triple Up's asserted claims?  *See Mwani*, 417 F.3d at

---

[2]  Youku arguably consented to jurisdiction in New York when it designated an agent for service of process there, *see* Dkt. 11-4 at 7, and accepted service of process through that agent in this case, *see* Dkt. 10.  Similar designations have historically been considered consent to suit in New York.  *See, e.g.*, *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 173, 175 (1939); *Bagdon v. Phil. & Reading Coal & Iron Co.*, 111 N.E. 1075, 1076 (N.Y. 1916).  More recent jurisprudential developments, however, have called that doctrine into question.  *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 637–41 (2d Cir. 2016).  Nonetheless, neither party has raised that issue here.  As a result, because Youku has "refuse[d] to identify any other [forum] where suit is possible," the Court "is entitled" to presume that jurisdiction is unavailable in any one state.  *Mwani*, 417 F.3d at 11.

[3]  To be sure, Triple Up's two theories pose slightly different constitutional questions:  one asks whether Youku's contacts with the District are constitutionally sufficient, whereas the other asks the same of Youku's contacts with the United States as a whole.  As explained below, the Court answers both questions in the negative.  And, because the insufficiency of Youku's U.S. contacts necessarily implies that its D.C. contacts are also insufficient, the Court will address its analysis to Youku's U.S. contacts nationwide.

11.  Because the Court finds that they are not, personal jurisdiction is unavailable under either of

Triple Up's theories.

**A.      Due Process Requirements for Specific Jurisdiction Under Rule 4(k)(2)**

        To establish specific jurisdiction over Youku under Rule 4(k)(2) and the Due Process

Clause, Triple Up must demonstrate that Youku "has sufficient contacts with the United States as

a whole," *Mwani*, 417 F.3d at 11, "such that [it] should reasonably [have] anticipate[d] being

haled into court [here]," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

These contacts need not be physical, but they must demonstrate that Youku has "purposefully

directed" its activities at residents of the forum, *Burger King*, 471 U.S. at 472 (quoting *Keeton v.

Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)), or that Youku has "purposefully avail[ed]

itself of the privilege of conducting activities within the [United States], thus invoking the

benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  In addition,

because Triple Up relies exclusively on a theory of specific jurisdiction, *see* Dkt. 11 at 14 n.3, its

causes of action against Youku must "aris[e] out of or relate[] to" Youku's United States

contacts, *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Helicopteros Nacionales

de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).[4]

        This case requires the evaluation of Youku's contacts with the United States in the

context of the internet.  Although such questions have become increasingly common, "the

relationship between a defendant's online activity and its amenability to suit in a foreign

jurisdiction often remains ill-defined."  *Revision Military, Inc. v. Balboa Mfg. Co.*, No. 5:11-CV-

---

[4]  "General jurisdiction," in contrast, is available against Youku only in the forum where it is
"essentially at home," *Goodyear*, 564 U.S. at 919.  Triple Up does not argue for general
jurisdiction here.  Dkt. 11 at 14 n.3.

149, 2011 WL 3875624, at *6 (D. Vt. Aug. 31, 2011), *vacated in part on other grounds by* 700

F.3d 524 (Fed. Cir. 2012).  The Supreme Court has yet to offer guidance in this area, *see, e.g.*,

*Walden v. Fiore*, 134 S. Ct. 1115, 1125 n.9 (2014) (noting that *Walden* did not present the

questions "whether and how a defendant's virtual 'presence' and conduct translate into 'contacts'

with a particular State," and "leav[ing] questions about virtual contacts for another day"), and the

existing guidance from the D.C. Circuit is limited, *see Gorman v. Ameritrade Holding Corp.*,

293 F.3d 506, 510–12 (D.C. Cir. 2002); *GTE*, 199 F.3d at 1350.  A number of principles have

nonetheless emerged.

First, it is clear that the "mere accessibility of the defendants' websites" in the forum

cannot by itself "establish[] the necessary 'minimum contacts.'"  *GTE*, 199 F.3d at 1350; 4A

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1073 & n.40 (4th

ed. updated Apr. 2016).  In a leading internet-era case, *GTE New Media Services Inc. v.

BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000), the D.C. Circuit observed that due process

limitations on personal jurisdiction are meant to "allow[] potential defendants to structure their

primary conduct with some minimum assurance as to where that conduct will and will not render

them liable to suit."  *Id.* at 1350 (quoting *World-Wide Volkswagen*, 444 U.S. at 297).  But, if

websites necessarily expose their operators to suit in any jurisdiction where they are accessed,

the court reasoned, "personal jurisdiction in [i]nternet-related cases would almost always be

found in *any* forum," and this constitutional assurance would be "shred[ded] . . . out of practical

existence."  *Id.* (emphasis added).  Thus, the *GTE* defendants' "Yellow Pages" phone directory

websites—without more—could not justify the exercise of specific personal jurisdiction over

them.  *Id.* at 1346, 1350.

This Court recently construed *GTE* to require the dismissal of an intellectual property suit between two nonresidents.  In *Hayes v. FM Broadcast Station WETT (FM)*, 930 F. Supp. 2d 145 (D.D.C. 2013), a Maryland plaintiff alleged that his trademarks had been infringed by a West Virginia company's internet radio station, which was accessible in the District via the defendant's website.  *Id.* at 147.  Personal jurisdiction was absent, however, because the plaintiff failed to show "that the defendants purposefully availed themselves of the District of Columbia any more than they availed themselves of every other jurisdiction in which their website was accessible."  *Id.* at 151–52 (citing *GTE*, 199 F.3d at 1349–50); *see also, e.g.*, *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009) (dismissing defamation lawsuit between two nonresidents because posting allegedly defamatory statements on the internet "is insufficient to establish personal jurisdiction," even if those statements "can be downloaded and viewed in the District of Columbia"); *Kline v. Williams*, No. 05-cv-1102 (HHK), 2006 WL 758459, at *5 (D.D.C. Mar. 23, 2006) (dismissing copyright lawsuit against non-residents where allegedly infringing images had been disseminated on the internet).

Of course, none of this is to say that a nonresident's purely online activities never give rise to personal jurisdiction.  Courts commonly find internet-based personal jurisdiction in at least two situations.  First, personal jurisdiction may exist where "residents use [a] website to engage in electronic transactions with the [defendant]"—that is, where the website functions as the defendant's storefront in the forum.  *Gorman*, 293 F.3d at 512–13;[5] *GTE*, 199 F.3d at 1348;

---

[5]  *Gorman* concerned *general* personal jurisdiction, and to that extent, may have been abrogated by recent Supreme Court cases narrowing general jurisdiction's scope.  *See Daimler*, 134 S. Ct. at 761; *Goodyear*, 564 U.S. at 919.  But *Gorman*'s reasoning remains valid as applied to *specific* jurisdiction, so long as that the cause of action "arises out of" District residents' internet transactions with the defendant.

4A Wright & Miller, *supra*, § 1073 & nn.42 & 51; *see also, e.g.*, *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005).  Second, jurisdiction may attach under the "effects test" first articulated in *Calder v. Jones*, 465 U.S. 783 (1984), which looks to whether "the defendant's conduct is aimed at or has an effect in the forum state." *GTE*, 199 F.3d at 1349 (quoting *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)); *see also, e.g.*, *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 673–79 (9th Cir. 2012); 4A Wright & Miller, *supra*, § 1073 & nn.60–68.

Against this backdrop, Triple Up's task is to distinguish this case from *GTE*, *Hayes*, and the like, where the only case-specific connection between the defendant and the forum was the accessibility of a website.  Here, Triple Up identifies what it sees as three distinguishing factors: (1) Youku's "geoblocking" technology; (2) the third-party, English-language video advertisements for American products that sometimes precede videos on Youku's website and that are geographically targeted; and (3) the purported "interactivity" of Youku's website.  *See* Dkt. 11 at 17–20.  Triple Up also points to certain non-internet-based contacts between Youku and the United States, including (4) the fact that Youku stock has been traded on the New York Stock Exchange, and (5) Youku's contractual agreements with American advertising, software, and entertainment firms.  *Id.* at 22–24.  Finally, the Court notes that Triple Up has waived any argument under the *Calder* "effects test" by failing to include one in its brief, *see generally* Dkt. 11, and that, in any event, Triple Up has failed to identify any significant effects in the United States of the alleged acts of infringement.  Ultimately, none of Triple Up's arguments is availing.

1.  *Geoblocking*

Triple Up's most novel argument concerns Youku's "geoblocking" capabilities.  Dkt. 11 at 17–20.  It is undisputed that Youku has the technology to block videos on its website from

being viewed in certain geographic locations, and Youku contends that it employs this technology for the subset of videos uploaded to its websites by its own employees.  Dkt. 7-1 at 2, 4 (Tang Decl. ¶¶ 7–8, 20).  Although the parties dispute whether the videos at issue here are of a kind that Youku would normally geoblock as a matter of its internal policy, *compare id.* at 4 (Tang Decl. ¶ 19) *with* Dkt. 11-2 at 13–14 (Zhang Decl. ¶ 9), there is little question that, in principle, Youku could geoblock *all* its videos from being displayed in the United States, had it the resources and inclination to do so.  Thus, Triple Up reasons, because Youku failed to take affirmative steps to prevent the videos from being displayed in the United States, it must have "purposefully transmitted specific broadcasts" to the United States "with full knowledge that they would be viewed" there.  Dkt. 11 at 19.

The Court, however, is unpersuaded that the possibility of "geoblocking" warrants a different result here than in *GTE*.  To hold otherwise would invite a sea change in the law of internet personal jurisdiction.  Although not framed as such in the briefs, Triple Up essentially contends that *GTE* rests on what is now a false factual premise:  Because geoblocking technology exists, Triple Up says, it is no longer the case that making a website accessible in the United States is "an unavoidable side-effect of modern internet technology," *Doe I*, 400 F. Supp. 2d at 121, or that basing personal jurisdiction on website accessibility would "almost always" expose the defendant to suit "in any forum in the country," *GTE*, 199 F.3d at 1350.  *See* Dkt. 11 at 19.  To be sure, the proposition that a website's *affirmative geoblocking* efforts should weigh *against* the exercise of personal jurisdiction is unobjectionable.  But Triple Up's proposed rule— which equates a *failure to geoblock* with purposeful availment—would effectively mandate geoblocking for any website operator wishing to avoid suit in the United States.  To say the least, such a rule would carry significant policy implications reaching beyond the scope of this lawsuit,

*see generally* Tracie E. Wandell, *Geolocation and Jurisdiction: From Purposeful Availment to Avoidance and Targeting on the Internet*, 16 J. TECH. L. & POL'Y 275, 297–304 (2011) (discussing potential obstacles facing a mandatory geoblocking regime), and, indeed, could limit U.S. residents' access to what is appropriately called the *World* Wide Web.  Perhaps, in the future, geoblocking will become sufficiently widespread that a failure to use it will be considered "purposeful" and assigned jurisdictional significance.  But Triple Up provides no factual basis for the Court to conclude that this is the case now, and, in any event, this Court is not the appropriate venue for reconsidering *GTE* in light of technological advances.

Even apart from these difficulties, Triple Up's argument is at odds with existing personal jurisdiction principles.  The operative test, after all, is whether the defendant has committed "some *act*" by which it "purposefully avails itself of the privilege of conducting activities within the forum."  *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (plurality opinion) (emphasis added) (quoting *Hanson*, 357 U.S. at 253).  The Court is unaware of any authority suggesting that a *failure to act* might constitute purposeful availment.  To the contrary, if personal jurisdiction attached whenever the defendant failed to take available steps to keep its products from reaching the forum, the Supreme Court's "stream of commerce" cases would look quite different.  In *J. McIntyre Machinery, Ltd. v. Nicastro*, for example, the British defendant manufacturer could have attempted to keep its goods out of New Jersey—even though it knew its distributor was targeting "the United States as a whole"—if it had instructed that its goods *not* be sold in that state.  *See id.* at 878–79.  In fact, the Chief Justice raised just such a hypothetical at oral argument, where he asked:

> What if [the defendant] said, ["We want to sell our goods in the United States,] but we don't like New Jersey, so don't sell our products in New Jersey[,"] and the Ohio [distributor] nonetheless does so?  Can you get them—can you hale them into court in New Jersey? . . .  He is not entering the stream of commerce in the United States.  He's entering a stream of commerce that *detours around* New Jersey.

Transcript of Oral Argument at 26–27, *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) (No. 09-1343) (emphasis added).  But the Court ultimately held that New Jersey had no personal jurisdiction over the defendant, *Nicastro*, 564 U.S. at 887, notwithstanding that it failed to take steps to "detour around" the forum.  Triple Up's argument here—which, as Youku notes, would "replace the purposeful availment standard with a requirement of purposeful *avoidance*," Dkt. 12 at 16—is difficult to square with this result.

    2.   *Third-Party Advertisements*

As further evidence of Youku's contacts with the United States, Triple Up points to the fact that Youku generates revenue by allowing third-parties to sometimes display English-language ads for American products before some of Youku's videos, and that these ads are allegedly selected based in part on the viewer's geographic location.  Dkt. 11 at 17–18.  It appears that Youku does not prepare these advertisements itself, but rather contracts with region-specific advertising groups, including groups in the United States, who then ensure that visitors to Youku's websites see ads targeted for their part of the world.  Dkt. 11-4 at 13 (Youku's Form 20-F filed with the SEC for fiscal year 2014).  These third-party ads, Triple Up says, represent "purposeful transmission[s] of advertisements to D.C. residents," which it says constitute purposeful availment of D.C. laws.  Dkt. 11 at 17–18.

The Court need not decide whether Youku's hosting of English-language ads for American audiences rises to the level of purposeful availment, however, because Triple Up's

lawsuit does not "aris[e] out of or relate[] to" those third-party advertisements, as specific jurisdiction requires.  *See Daimler*, 134 S. Ct. at 754 (quoting *Helicopteros*, 466 U.S. at 414 n.8).

The first step in the Court's relatedness analysis is to decide on the proper standard.  The Supreme Court has yet to pass on this issue, *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318 (3d Cir. 2007), and it remains an open question in this Circuit, *cf. Alkanani*, 976 F. Supp. 2d at 27 (noting the divergence of views among other circuits).  Nonetheless, "[t]hree approaches predominate." *O'Connor*, 496 F.3d at 318.  At the most restrictive end of the spectrum, courts require the defendant's contacts to have been the "proximate cause"—or at least something similar to the proximate cause—of the plaintiff's alleged injury. *Id.* at 318–19; *see, e.g.*, *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 508 (6th Cir. 2014); *O'Connor*, 496 F.3d at 323; *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59, 65 (1st Cir. 2002).  Other courts are satisfied if the contacts are merely a "but-for cause" of the injury.  *O'Connor*, 496 F.3d at 319; *see, e.g.*, *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385–86 (9th Cir. 1990).[6]  And a third category of courts, including, notably, the D.C. Court of Appeals, require only a "discernable relationship" between the contacts and the plaintiff's cause of action.  *O'Connor*, 496 F.3d at 319–20; *see, e.g.*, *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 334–35 (D.C. 2000) (en banc).[7]  Unlike the other tests, the

---

[6]  The Supreme Court reversed *Shute v. Carnival Cruise Lines* on other grounds, 499 U.S. 585 (1991), but the Ninth Circuit held that its "but for test" was unaffected, *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995).

[7]  It is unclear whether *Shoppers* held that "discernable relationship" is the appropriate standard for the nexus requirement under the D.C. long-arm statute, the Due Process Clause, or both.  *See* 746 A.2d at 335 (holding that the nexus requirement in the long-arm statute should be interpreted "in the same way" as the Supreme Court's due process nexus requirement, and that that way is

"discernable relationship" test does "not . . . require a causal connection between the defendant's [activities] and the plaintiffs' lawsuit." *Shoppers*, 746 A.2d at 335 (quoting *Thomason v. Chem. Bank*, 661 A.2d 595, 603 (Conn. 1995)).  Instead, "courts that follow this approach consider the totality of the circumstances," *O'Connor*, 496 F.3d at 320 (citing *Shoppers*, 746 A.2d at 336), and from that attempt to infer whether the exercise of jurisdiction in the forum was "reasonably foreseeable," *Shoppers*, 746 A.2d at 336.

For present purposes, it is sufficient to hold that the "discernable relationship" test is not the applicable standard:  rather, "the plaintiff [must] show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit." *Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 247 (D.D.C. 2015).  Two considerations inform the Court's conclusion.  First, by "vary[ing] the scope of the relatedness requirement according to the 'quantity and quality' of the defendant's contacts," the discernable relationship test blurs the distinction between specific and general jurisdiction.  *O'Connor*, 496 F.3d at 321 (quoting William M. Richman, *Review Essay: A Sliding Scale to Supplement the Distinction Between General and Specific Jurisdiction*, 72 Cal. L. Rev. 1328, 1345 (1984) (book review)).  The D.C. Court of Appeals in *Shoppers*, for example, held that the "discernable relationship" requirement should be relaxed in light of the defendant's "extensive and repeated" forum contacts, despite agreeing that those contacts had "no inherent relationship" to the plaintiff's cause of action.  746 A.2d at 336.  The Supreme Court has made clear, however, that general and specific jurisdiction are "analytically distinct categories, not two points on a sliding scale," *O'Connor*, 496 F.3d at

_____

the "discernable relationship" test).  In any event, because the Court's opinion turns only on the application of the Due Process Clause, the D.C. court's opinion is not controlling.

321 (citing *Helicopteros*, 466 U.S. at 414–16), and that gap has only widened as general jurisdiction has assumed an increasingly "reduced role," *Daimler*, 134 S. Ct. at 755 (quoting *Goodyear*, 565 U.S. at 925). Second, although the discernable relationship test has the benefit of "flexib[ility]," *Shoppers*, 746 A.2d at 335, its "freewheeling totality-of-the-circumstances" approach deprives litigants of the type of adequate notice that due process requires, *O'Connor*, 496 F.3d at 321–22. As noted above, "[t]he Due Process Clause exists, in part, to give 'a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *GTE*, 199 F.3d at 1350 (quoting *World-Wide Volkswagen*, 444 U.S. at 297). The discernable relationship test defies this predictability and "replaces structured analysis" with "[u]nbounded judicial intuition." *O'Connor*, 496 F.3d at 322. As a result, the Court concludes that Supreme Court precedent precludes the application of the "discernable relationship" test.

With the discernable relationship test off the table, it is clear that Youku's third-party advertisements fail even the permissive "but for" test. Triple Up does not appear to argue otherwise. *See* Dkt. 11 at 15–16 (relying only on the discernable relationship test); *id.* at 20–24 (not mentioning any type of causation). Indeed, there is no evidence that the presence of any ads for American products played any role in making the allegedly infringing videos viewable on Youku's websites from within the United States. As Youku notes, even if Youku's websites featured only Chinese-language ads for Chinese products aimed at Chinese consumers—or if they featured no advertisements at all—Triple Up's "allegations would remain the same." Dkt. 12 at 13. The existence of geographically-targeted advertisements is therefore causally independent of the alleged availability of the films at issue. Thus on these facts—where the advertisements bear no causal relationship to the plaintiff's cause of action—the Court concludes

that selling internet ad space to regional agencies who then license that space to local businesses does not automatically subject the website to the jurisdiction of every forum in which it is accessible.[8]

3.  *"Interactivity"*

Triple Up's third argument, which concerns "interactivity," *see* Dkt. 11 at 19–20, is even further from the mark.  Although some courts have used a website's "interactivity" as a kind of "jurisprudential heuristic" for internet personal jurisdiction, 4A Wright & Miller, *supra*, § 1073 (discussing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997)), the D.C. Circuit has defined the inquiry in a narrower sense.  In this Circuit, a website's "interactivity" is generally relevant to the constitutional issue only insofar as it illustrates whether the website allows its operator "to engage in real-time transactions with District of Columbia residents."  *See Gorman*, 293 F.3d at 513 (citing *Zippo*, 952 F. Supp. at 1124)); *Doe I*, 400 F. Supp. 2d at 121.  Here, Youku's only alleged "transactions" with United States residents are its "Youku VIP" subscriptions (assuming, as is likely the case, that at least some U.S. residents subscribe).  But Triple Up does not raise this as an argument for the assertion of specific personal jurisdiction, *see* Dkt. 11 at 19–20, perhaps because the Youku VIP program is unrelated to the claims at issue.  Instead, Triple Up emphasizes that the websites "permit[] users to create personal user accounts," *id.* at 19—but this hardly evinces any "interactivity" at all, let alone a degree of interactivity that would allow Youku to engage in real-time internet

---

[8]  Although not cited by Triple Up, the Ninth Circuit has held that, in the limited context of the *Calder* "effects test," selling internet ad space to third-parties in the forum is evidence of "express aiming."  *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011).  As discussed below, Triple Up has not raised an effects-test argument, nor could one likely succeed on these facts.  *See infra* Part III.A.6.

transactions.  Although the feature of Youku's websites that allows users to "upload videos" may be interactive in some sense, *see id.* at 19, neither party has argued that this feature is in any way relevant to the specific jurisdiction inquiry.  And the other "interactive" features that Triple Up touts—namely, that Youku's websites "permit[] users to . . . search for [and access] video content"—render Youku's websites "no more 'interactive' than any basic website," and certainly "not the virtual equivalent of being present in the District of Columbia."  *Doe I*, 400 F. Supp. 2d at 121.  This overstated "interactivity" does not support the exercise of personal jurisdiction.

4.  *Listing on the New York Stock Exchange*

Turning to Youku's non-internet contacts with the United States, Triple Up observes that Youku has been listed on the New York Stock Exchange and has been subject to reporting obligations under U.S. securities law, and argues that these contacts support a finding of jurisdiction.  Dkt. 11 at 23.  But the claims at issue have no "discernable relationship"—causal or otherwise—to Youku's stock listings, and therefore do not "arise from or relate to" that contact with the United States.  In addition, "the prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings (such as making SEC filings and designating a depository for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences."  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000).  These contacts do not further Triple Up's case, either.

5.  *Contracts with U.S. Companies*

Triple Up also points to Youku's various contracts with American firms, including "third-party advertising agencies," a "U.S. software company" employed to help Youku combat copyright infringement, and "U.S. entertainment companies" employed "to produce original

content" for Youku. Dkt. 11 at 22–24. But these contacts again fail the relatedness requirement. "Courts have appropriately concluded that an injury sounding in tort"—such as copyright infringement—"does not 'arise from' a contract for services for the purpose of specific jurisdiction." *Alkanani*, 976 F. Supp. 2d at 27 (collecting cases). That rule applies with particular force here, where the contracts are unrelated in any meaningful sense to Triple Up's copyright infringement claims.

6. *Effects Intentionally Directed at the United States*

Finally, the Court acknowledges the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984). *Calder* upheld the exercise of personal jurisdiction over nonresident defendants on the grounds that their "intentional . . . actions were expressly aimed at [the forum]," which was where "the brunt of the harm" was felt. *Id.* at 789. It now stands for the principle that the "effects" of a non-forum actor's intentional conduct can, in some circumstances, "create[] the necessary contacts with the forum." *Walden*, 134 S. Ct. at 1123.

The Ninth Circuit has taken the leading role in adapting the effects test to internet copyright infringement actions, holding that "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *Panavision Int'l L.P.*, 141 F.3d at 1321. In some of its broader applications of the doctrine, the Ninth Circuit has held that willful copyright infringement is always "expressly aimed" at "the place where the copyright is held,"[9] *Wash. Shoe Co.*, 704 F.3d at 678, and that a celebrity gossip

---

[9] *But cf. Walden*, 134 S. Ct. at 1124 (reversing the Ninth Circuit's application of the effects test on the grounds that the Ninth Circuit improperly "shift[ed] the analytical focus from [the defendant's] contacts with the forum to his contacts with [the plaintiffs]").

website was "expressly aimed" at California because it "continuously and deliberately exploited" its California user base, *Mavrix*, 647 F.3d at 1229–30. The D.C. Circuit has also recognized the effects test in the internet context. *See GTE*, 199 F.3d at 1349 (citing *Panavision Int'l L.P.*, 141 F.3d at 1321); *Kline*, 2006 WL 758459, at *5 (applying *Calder* to internet copyright action). It thus remains plausible that a foreign copyright infringer could be subject to personal jurisdiction solely by virtue of its conduct's internet "effects" in the United States.

The Court has no occasion to address that issue here, however, because Triple Up raises no effects-test argument, *see* Dkt. 11, and has now waived its chance to do so, *see City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003) (arguments not developed in briefs are waived). Nor is it likely that such an argument could succeed. To the contrary, it is difficult to imagine how Youku's posting of the videos could be said to have been "expressly aimed" at the United States, or how it "caused harm" there. After all, Youku's websites are written entirely in Mandarin Chinese. Dkt. 7-1 at 2 (Tang Decl. ¶ 5). The three films are Taiwanese in origin, Dkt. 11-1 at 1 (Hsu Decl. ¶ 2); appear with Mandarin captions, *see* Dkt. 11-2 at 4–5, 7–8, 11 (Zhang Decl. ¶¶ 5(f) & (g), 6(f) & (g), 7(f) & (g); and, presumably, are themselves in Mandarin.[10] The alleged copyright holder has no apparent connection to the United States. *See* Dkt. 1 at 4 (Compl. ¶ 15); Dkt. 7-1 at 6 (Tang Decl. ¶ 26); Dkt. 11-1 at 2 (Hsu Decl. ¶ 12). And, far from evidence that Youku's display of the films "achieved a substantial [United States] viewer base" that is "an integral component of [its] business model," *Mavrix*, 647 F.3d at 1230,

---

[10] Although the record does not expressly state that the films are in Mandarin, Triple Up implies that they are. For example, Triple Up characterizes Youku as "taking commercial advantage of the *Chinese-language* streaming video broadcast market in the United States," Dkt. 11 at 6 (emphasis added), but specifically distinguishes the ads on Youku's websites as "*English*-language video advertisement[s]." *Id.* at 13, 18, 22, 24 (emphasis added).

there is no allegation that anyone other than Triple Up's attorneys viewed the three films from within the United States at all.  Thus, even if a *Calder* "effects test" argument were properly before the Court, it would likely prove unavailing.

*      *      *

As a result, Triple Up has failed to show that Youku has sufficient "minimum contacts" to warrant the exercise of specific personal jurisdiction with respect to the claims at issue.

**B.      Jurisdictional Discovery**

The Court also denies Triple Up's request for additional jurisdictional discovery.  It is, of course, true that "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified."  *GTE*, 199 F.3d at 1351.  The party, however, "must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant" and that belief must be more than "conjecture or speculation."  *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1093–94 (D.C. Cir. 2008).  Here, Triple Up fails to make such a demonstration.

Specifically, Triple Up seeks evidence related to (1) "the nature and extent of Youku's streaming broadcasts and advertisements;" (2) "revenues associated therewith;" (3) "Youku's geocoding and geoblocking capabilities, policies, and activities;" (4) "membership and revenues from the 'Youku VIP' service" in the United States; (5) "Youku's computer servers and its web-site related activities" in the United States; (6) Youku's "dealings" with U.S. advertising agencies, entertainment content producers, and software companies; and (7) "investment-related activities in the [United States]," by which Triple Up presumably means Youku's one-time presence on the New York Stock Exchange.  Dkt. 11 at 25.

Most of these requests are not aimed at information relevant to whether specific personal jurisdiction exists in this case.  As to the first two requests, the Court has already determined that third-party advertisements on Youku's website are not sufficiently related to Triple Up's causes of action to serve as a hook for specific jurisdiction.  *See supra* Part III.A.2.  That conclusion stands regardless of the "number and nature of advertisements transmitted" to the United States or "how much revenue" those advertisements generate.[11]  Dkt. 11 at 25–26.  As to the third request concerning geoblocking, the Court has already held that failure to geoblock does not rise to the level of purposeful availment, and that Youku's internal policies on this point are immaterial.  *See supra* Part III.A.1.  As to the fourth request aimed at the "Youku VIP" service, Triple Up has not argued that the service could establish specific jurisdiction here, and the Court does not see how it reasonably could do so, given that this case does not arise from Youku VIP contracts, services, or content.  *See supra* Part III.A.3.  As to Triple Up's sixth request concerning Youku's "dealings" with U.S. firms, the Court fails to see how these dealings have any causal nexus with the claims at issue.  *See supra* Part III.A.5.  And, as to the seventh request regarding Youku's listing on the New York Stock Exchange, the Court has already deemed that fact jurisdictionally insignificant.  *See supra* Part III.A.4.

The one request that warrants discussion is Triple Up's fifth request for discovery into whether Youku operates any servers or maintains its websites from the United States.  Youku's

---

[11]  As explained above, if Youku posted the allegedly infringing works as part of a concerted effort to attract U.S. viewers, evidence of that fact might conceivably be relevant to an effects-test theory.  *See supra* Part III.A.6.  But Triple Up has not presented that argument here. Moreover, jurisdictional discovery is not the occasion for "an unwarranted fishing expedition," *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014), and Triple Up has presented no good-faith basis to believe that such evidence exists.

representative has declared that "Youku's computer servers are *principally* located, and its websites are *principally* created and maintained, in the [People's Republic of China]," and that "Youku does not have any computer servers located, nor does it create or maintain its websites, from the *District of Columbia*." Dkt. 7-1 at 4 (Tang Decl. ¶ 18) (emphases added). Triple Up is thus correct that this declaration leaves open the possibility that Youku operates its websites from *elsewhere* in the United States. Dkt. 11 at 26. And, given the Court's analysis above, if Youku maintains a server or operate its websites from within the United States, and if those activities are causally related to the availability of Youku's website in the United States, that fact could be jurisdictionally relevant.

Nonetheless, the Court concludes that Triple Up's request for this discovery is merely conjectural. Youku did not specifically declare that it had no servers in the United States, but it did declare that it has no "officers or employees" here. Dkt. 7-1 at 3 (Tang Decl. ¶ 9). Although not literally impossible, it would be surprising, to say the least, if Youku operated its website from the United States in a jurisdictionally relevant way without maintaining any employees there and without any public record of its U.S.-based activities. And Triple Up has identified no reason to believe that such a server exists. A plaintiff "is not entitled to jurisdictional discovery just because [it] hopes that it might turn something up." *Hayes*, 930 F. Supp. 2d at 152. The request for jurisdictional discovery, accordingly, is denied.

**CONCLUSION**

The Court will grant Youku's motion to dismiss the complaint for lack of personal jurisdiction, Dkt. 7 at 13–23, and will accordingly dismiss the action. As a result, the Court lacks personal jurisdiction to rule on Youku's motion to dismiss the complaint for failure to state a claim, Dkt. 7 at 23–31, and will deny that aspect of the motion as moot.

A separate order issues concurrently with this opinion.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 24, 2017